USDC SCAN INDEX SHEET



AMENDOLA

AIG INSURANCE CO

MR
3:95-CV-00659
*39*
*STMTFACTS.*

JOHN L. VIOLA (State Bar No. 131407)
ADAMS, DUQUE & HAZELTINE LLP
777 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone (213) 620-1240

Attorneys for Defendants
AIG LIFE INSURANCE COMPANY and SHARP HEALTHCARE



FILED
JUN 28 1996
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ROBIN S. AMENDOLA,

    Plaintiff,

vs.

A.I.G. INSURANCE COMPANY, SHARP HEALTHCARE, and DOES 1 through 100,

    Defendants.

Case No. 95-0659S (CM)

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

DATE: July 29, 1996
TIME: 10:30 a.m.
CTRM: 4

### I. UNCONTROVERTED FACTS

1. The Sharp HealthCare Personal Accident Insurance Plan (the "Plan") is funded by AIG Life Insurance Company's ("AIG Life") Policy No. PAI 8034404, issued to the San Diego Hospital Association (dba Sharp HealthCare). [Declaration of Priscilla Aiken ("Aiken Decl."), ¶ 3.]

2. The Plan's Summary Plan Description ("SPD"), effective January 1, 1993, states that the Plan Administrator, the Sharp Choice Administrative Committee, has discretionary authority to interpret the provisions of the Plan as follows: "The [Plan's]



sponsor, Sharp HealthCare, confers the maximum discretionary authority permitted by law to the Plan Administrator to interpret, construe, and administer the provisions of the plans." [Declaration of Andrea Lew Vicino ("Vicino Decl."), Ex. 1, p. INT/1.]

3. The plan administrator delegated its discretionary authority regarding full and fair review of claims for Plan benefits to AIG Life. AIG Life, which serves as the ERISA claims review fiduciary, uses such discretionary authority in determining claims for Plan benefits and in determining appeals of denials of such claims. [Vicino Decl., ¶ 4; Aiken Decl., ¶ 4.]

4. The SPD provides that Plan benefits will be paid "[w]hen injury results in any of the following losses to an Insured Person within 365 days of the date of the covered accident which caused the Injury . . . LOSS OF: Life . . ." [Vicino Decl., Ex. 1, p. AD&D/80.]

5. The SPD defines "Injury" to mean "bodily injury caused by an accident occurring while the policy is in force as [to] the Insured Person and resulting directly and independently of all other causes in loss." [Vicino Decl., Ex. 1, p. AD&D/79.]

6. Royal C. Amendola was employed as a Certified Nurse's Aid at Sharp Memorial Hospital. [Aiken Decl., ¶ 5.]

7. As an employee of Sharp Memorial Hospital, a member of the Sharp HealthCare group of hospitals, Mr. Amendola was a covered employee under the Plan and his beneficiary was eligible for accidental death benefits under the Plan. [Aiken Decl, ¶ 5.]

8. Plaintiff, Amendola's brother and his Plan beneficiary, submitted a claim for Plan benefits on or about September 14, 1993 in connection with Amendola's death

2

1  on March 26, 1993. [Aiken Decl., ¶ 5, Ex. 1, p. 141.]

3      9. The claim form lists the cause of death as "acute morphine intoxication," "self-injected -- at his place of residence." [Aiken Decl., Ex. 1, p. 141.]

6      10. Upon receipt of plaintiff's claim for Plan benefits, AIG Life conducted an external investigation regarding the circumstances surrounding Amendola's death and his medical history. AIG Life received and reviewed the following information as part of its investigation: affidavit of claimant signed by Robin S. Amendola; the certificate of death; the autopsy report; toxicology and investigative reports of the Office of the Medical Examiner, San Diego County; a letter dated March 31, 1993 to the Office of the Medical Examiner, San Diego County from Dudley Amendola, Royal Amendola's father; a recorded interview with Jean Padilla, Royal Amendola's sister, of December 1, 1993; a signed statement from Dudley Amendola; records of Dr. H. Randall Hicks, plaintiff's treating physician; records of the McDonald's Center for Alcohol and Drug Abuse; records of the University of California, San Diego Medical Center; records of Sharp Rees-Stealy Medical Group; and the report of the San Diego Police Department. [Aiken Decl., Ex. 1, p. 54.]

19     11. The Autopsy Report performed by the County of San Diego, Office of the Medical Examiner, indicates the cause of death as "acute morphine intoxication" with findings of:

"1.   Acute morphine intoxication.
       a.   Pulmonary edema and congestion of viscera.
 2.   Intravenous narcotism
       a.   Early needle tracks on left arm.
 3.   HIV positive by history." [Aiken Decl., Ex. 1, p. 143.]

///
///

12.  The Medical Examiner's opinion was as follows:

"The decedent was a 38 year old male with a history of drug abuse. He was found dead at home with intravenous paraphernalia nearby. Autopsy revealed the cause of death to be acute morphine intoxication. Investigation revealed that the drug was only used for recreational purposes and no suicidal intent was found."

[Aiken Decl., Ex. 1, p. 143.]

13.  The Medical Examiner's Investigative Report discussed the condition of Amendola and his apartment when his body was found by the police as follows:

"The decedent, clad in undershorts only, was observed in a reclining position on a closed toilet in a bathroom in his apartment. The head was flexed forward and turned slightly to the right with the back resting on the toilet tank. Both arms extended to the floor. Both legs were flexed at the knees with the feet resting on the floor. The body was cool and partially rigid with fixed lividity consistent with body position. A small amount of frothy purge exuded from the mouth. A belt was draped over the left thigh. A small cotton swab covered a needle injection site in the left antecubital fossa. A syringe with needle attached, a needle cover and a cotton swab envelope was on the sink near the decedent's left.

"On a small stand in the living room was a spoon cooker with a small cotton wad and a cotton tipped applicator. Also on

the table were a decorative candle which had been lit, a vial of sodium chloride, a cotton swab, an empty drinking glass and a disposable lighter. . . ."
[Aiken Decl., Ex. 1, p.152.]

14. A Toxicology Report by the San Diego Office of the Medical Examiner revealed that heroin was detected on the spoon and both heroin and morphine were detected in the syringe. [Aiken Decl., Ex. 1, p. 66.]

15. In addition to reviewing the information from the Medical Examiner's Office concerning Amendola's illicit drug use, AIG Life also conducted an extensive examination into Amendola's medical history. AIG Life's investigation revealed that Amendola was a long term drug abuser -- he had been taking and selling drugs since around the age of 15 -- with a dependency on heroin and alcohol. He was admitted to various treatment programs to assist him in overcoming this problem. Amendola's family was aware to a certain degree of Amendola's drug and alcohol problems. [Aiken Decl., Ex. 1, p. 92.]

16. During a recorded interview with Jean Padilla, Amendola's sister, AIG Life discovered that Amendola had been hospitalized for drug/alcohol rehabilitation. She stated that Amendola's alcohol problems dated back "[t]o as long as I can remember." [Aiken Decl., Ex. 1, p. 111-12.] When asked if Amendola used illegal drugs, Ms. Padilla responded: "Not in front of me, but I'm sure he did." [Aiken Decl., Ex. 1, p. 113.] Further, Ms. Padilla indicated that she believed, based on conversations with Amendola, that he used marijuana, possibly took pills, possibly used cocaine and injected drugs including heroin. [Aiken Decl., Ex. 1, p. 114.]

17. In a signed statement, Dudley Amendola, Amendola's father, stated that "Royal had an alcohol abuse problem since he was discharged from the Army" and that

5

1  "[i]n 1990 or 1991 he went through an alcohol abuse program at Scripps Hospital in La
2  Jolla." [Aiken Decl., Ex. 1, p. 106.] Dudley Amendola further admitted that "[b]ased on
3  the needle marks found on his arm by the coroner, he must have injected drugs. . . . [Aiken
4  Decl., Ex. 1, p. 106.]

6         18.    In an interview on December 1, 1993 conducted by Equifax Services
7  with respect to plaintiff's claim, Dudley Amendola stated that Amendola joined the United
8  States Army in his teens. While in the Army, Amendola became involved with a drug
9  operation. Amendola's exposure to alcohol and drugs in the Army led to alcohol and drug
10 abuse ever since his release from the service. Further, Dudley Amendola indicated that
11 although he did not have specific knowledge of drug abuse, Amendola led his father to
12 believe that there was a history of drug abuse. With respect to his son's death, Dudley
13 Amendola believes that his son "probably decided to use drugs 'one last time,' and got some
14 bad drugs, which caused his death." Dudley Amendola claimed that the Coroner's Office
15 informed him that "Amendola did not have a tremendous amount of drugs in his system, but
16 what he used was apparently of poor quality, which resulted in a drug overdose." [Aiken
17 Decl., Ex. 1, pp. 99-100.]

19        19.    AIG Life's investigation also revealed that Amendola had received
20 treatment for drug and alcohol use at the Alvarado Parkway Institute in 1988 and from
21 Stepping Stones in 1986. [Aiken Decl., Ex. 1, p. 159.] Further, the records from the
22 McDonald Center for Alcohol and Drug Abuse revealed that Amendola was treated there for
23 multiple drug dependency, including the chronic use of heroin, from October 2 through
24 October 25, 1990. [Aiken Decl., Ex. 1, p. 164.] These records further indicate that
25 Amendola had an extensive history of alcohol and drug dependency dating back to thirteen
26 years of age. Further, Amendola had had several overdoses of Seconal, Methamphetamine,
27 heroin and Valium, as well as "a history of several suicide attempts." [Aiken Decl., Ex. 1,
28 p. 165.] The McDonald Center determined that inpatient treatment for Amendola for

chemical dependency was appropriate because: "he has hallucinations and blackouts, he has been unable to limit the amount of drug use and the daily use of same, he has had legal problems and several arrests for possession, he has had legal problems, and progression of tolerance to chemical abuse." [Aiken Decl., Ex. 1, pp. 166.]

20. In the McDonald Center's Patient Self-Assessment for Alcohol and Other Drug Use, Amendola admitted to use of a variety of drugs (the number in parentheses is the age at which Amendola first used the particular drug): marijuana (13); alcohol (13); L.S.D, mescaline, peyote and other hallucinogens (15); P.C.P. (21); stimulants, such as cocaine, amphetamines, diet pills, etc. (13); sedatives, barbiturates, downers (13); heroin, morphine and other opiate derivatives (19); and glues, solvents, aerosols, paints, etc. (12). In addition, Amendola admitted that he "was abusing and selling my scripts [for valium and talwin] for other drugs and alcohol." [Aiken Decl., Ex. , pp. 200-203.] Amendola also indicated that within the year prior to admission to the McDonald Center, he used alcohol, marijuana and opiates (which include heroin and morphine) one to three times per month and barbiturates one to five days a week. [Aiken Decl., Ex. 1, p. 183.]

21. By letter dated February 24, 1994, AIG Life denied plaintiff's claim for Plan benefits. The denial letter details the information reviewed by AIG Life and states that the Amendola's death was not accidental under the terms of the Plan. The denial letter further informed plaintiff that under ERISA he had the right to review AIG Life's decision through an appeal. AIG Life also requested that plaintiff provide any additional information regarding Amendola's death. [Aiken Decl., ¶ 6, Ex. 1, pp. 54-55.]

22. Subsequently, plaintiff, by letter dated May 28, 1994, appealed AIG Life's denial of his claim. In his letter, plaintiff did not offer any further information regarding Amendola's death or his history of drug and alcohol abuse. [Aiken Decl., Ex. 1, pp. 46-47.]

D:\7472\51645\JLV\PLEADING\018
06/21/96

23. By letter of June 28, 1994, AIG Life acknowledged receipt of plaintiff's May 28, 1994 letter and informed him that the claim would be reviewed by AIG Life's ERISA Appeals Committee. AIG Life <u>again</u> requested that plaintiff provide it with additional information in support of his claim. [Aiken Decl., Ex. 1, p. 45.]

24. On August 24, 1994, having heard nothing further from plaintiff, AIG Life's ERISA Appeals Committee reviewed the claim and upheld the denial of benefits. [Aiken Decl., ¶ 7.] By letter dated September 9, 1994, AIG Life informed plaintiff of its decision. [Aiken Decl., Ex. 1, p. 33.]

25. Although plaintiff sent a letter dated October 24, 1994 to AIG Life with respect to AIG Life's final decision to deny the claim, he still provided no additional information to support his position. [Aiken Decl., ¶ 8, Ex. 1, pp. 22-26.]

## II. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

2. The Plan grants the Plan administrator discretionary authority to determine whether a claimant is eligible for Plan benefits.

3. The Plan administrator delegated its fiduciary responsibility for the full and fair review of claims for Plan benefits to AIG Life. 29 U.S.C. § 1105(c)(1); <u>Madden v. ITT Long Term Disability Plan for Salaried Employees</u>, 914 F.2d 1279, 1283 (9th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991).

///
///

4. Accordingly, the arbitrary and capricious standard of review is applicable to AIG Life's denial of plaintiff's claim for plan benefits. <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

5. Under the arbitrary and capricious standard, AIG Life's determination of plaintiff's claim for Plan benefits must be upheld if it is based on substantial evidence. <u>Taft v. Equitable Life Assurance Society</u>, 9 F.3d 1464 (9th Cir. 1993).

6. Under federal common law developed under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), a death is not considered an "accident" where the plan participant knew or reasonably should have known that serious bodily injury or death was substantially likely to occur as a result of his or her intentional conduct. <u>Wickman v. Northwestern National Ins. Co.</u>, 908 F.2d 1077 (1st Cir. 1990); <u>Todd v. AIG Life Ins. Co.</u>, 47 F.3d 1448, 1455-56; <u>McClain v. Metropolitan Life Ins. Co.</u>, 820 F.Supp. 169 (D.N.J. 1993); <u>Holsinger v. New England Mutual Life Ins. Co.</u>, 765 F.Supp. 1279 (E.D. Mich. 1991).

7. Here, given his long history of drug abuse and for drug treatment and his work as a nurse's aid, Amendola knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of self-injecting morphine, especially when heroin was also found in the needle.

8. Accordingly, AIG Life's decision to deny plaintiff's claim for Plan benefits was based on substantial evidence and, therefore was not arbitrary and capricious and must be upheld.

9. Even under the <u>de novo</u> standard of review, AIG Life's claim to deny Plan benefits to plaintiff was correct. <u>McClain v. Metropolitan Life Ins. Co.</u>, <u>supra</u>.

10. Accordingly, there is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law on the Second Amended Complaint. Fed.R.Civ.P. 56.

If any of the following Uncontroverted Facts are construed to be Conclusions of Law, the same shall be deemed to be Conclusions of Law. If any of the foregoing Conclusions of Law are construed to be Uncontroverted Facts, the same shall be deemed to be Uncontroverted Facts.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: _____    _____
UNITED STATES DISTRICT JUDGE

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of <u>Los Angeles</u>, State of California.

I am over the age of 18 and not a party to the within action; my business address is Adams, Duque & Hazeltine LLP, 777 South Figueroa Street, Tenth Floor, Los Angeles, CA 90017. I am readily familiar with the practices of Adams, Duque & Hazeltine LLP for collection and processing of correspondence for mailing with the United States Postal Service. Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

On <u>June 27, 1996</u>, I served the foregoing document described as <u>STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW</u> on <u>the interested parties</u> in this action

[ ]  by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

[X]  by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

JOHN P. STENNETT, ESQ.
STENNETT & STENNETT
501 W. BROADWAY, SUITE 820
SAN DIEGO, CA 92101

[X]  (BY MAIL) I placed such envelopes with postage thereon fully prepaid in the United States mail at <u>Los Angeles</u>, California, following ordinary business practices. Executed on <u>June 27, 1996</u>, at <u>Los Angeles</u>, California.

[ ]  (BY PERSONAL SERVICE) I delivered such envelope by hand to the office of the addressee.
Executed on _____, 19__, at _____, California.

[ ] (State)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
[X] (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

<u>Cynthia K. Butler</u>
TYPE OR PRINT NAME

SIGNATURE